In the matter of the estate of JULIUS HEIM, deceased.

[Decided June 26th, 1944.]

*Messrs. Drewen & Nugent (Mr. John Drewen,* of counsel), for the appellant Frederick E. Bauer.

*Messrs. Milton, McNulty & Augelli (Mr. Joseph Keane,* of counsel), for the respondents Howard Heim et al.

*Mr. Kenneth J. Dawes* and *Mr. Constantine Donato,* for the respondents Irma Schultz et al.

*Mr. Otto E. Riemenschneider,* for the respondent Ruth Heim Gardner.

*Mr. Cyrus W. Lunn,* for the respondents Charles L. Heim et al.

*Mr. Jacob Stiskin,* for the respondent Pauline Roggenbrodt.

FIELDER, VICE-ORDINARY.

Julius Heim died October 29th, 1942. He had executed a will July 15th, 1942, against which no caveat was filed and the will was admitted to probate by the surrogate of Hudson

County November 9th, 1942. The proofs show that testator died seized of six parcels of real estate valued at about $6,000 and possessed of personal estate worth about $83,000.

By his will, after providing for payment of his debts, the testator devised five parcels of his real estate to his executor with directions to sell and distribute the proceeds (a) one-third to a nephew and his wife, (b) one-third in trust for the benefit of a grandnephew and (c) one-third in trust for the benefit of another grandnephew. He devised the sixth parcel of real estate to Jeanette Heim, the widow of a deceased brother. The will then set aside $500 for care of a burial plot, devised the plot to his brother Charles and gave the balance of his estate "to my friend and counsellor, Frederick E. Bauer, as a token of my affection and esteem for him over the many kindnesses and favors that he has done for me throughout my lifetime" and appointed Bauer executor. Bauer is a lawyer and the draftsman of the will.

In January, 1943, a petition of appeal from probate was filed by a nephew of decedent, and in April, 1943, a second petition of appeal was filed by another nephew. The petitions of appeal presented the questions (a) lack of testamentary capacity of testator, (b) undue influence exerted on the testator by Bauer, and (c) the will not executed in accordance with statutory requirements, which last named ground was not pressed. On the return day of citations issued to all interested parties, the Hudson Orphans Court referred the appeal to a master to take testimony and report his findings to the court. In the proceedings before the master, all of decedent's heirs-at-law and next of kin (except a sister who was not a beneficiary under the will) joined in prosecuting the appeal. After taking testimony the master reported that probate of the will should be revoked, and thereafter the Orphans Court, upon the master's findings, entered its decree December 29th, 1943, confirming the master's report and adjudging that the paper-writing probated was not Heim's last will and testament and revoked the letters testamentary issued thereon. This appeal is from that decree and it is submitted on the record sent up from the court below without any further evidence offered. The questions to be determined

are whether the testator possessed testamentary capacity at the time of executing the will and whether he was influenced by Bauer in the execution thereof.

The testator was ninety years old at the date of his will and he was a childless widower, his wife having died in 1927. He had been an electrotyper and had given up work several years prior to his death. From his earnings and thrift he had been able to build up a substantial estate. He had a habit of making and keeping notes or entries on scraps of paper and on envelopes received through the mail and he had kept a diary for many years and as late as 1937. From his notes and his diary it can be gathered that he was a man of intelligence. His living blood relatives were Charles Heim a brother, Adeline Butterfield a sister, both of whom resided in California many years, and Pauline Roggenbrodt a sister, who resided near him in Union City; also several nephews and nieces who were children of deceased brothers, some of whom resided at a considerable distance from him. He had been a benefactor to his brothers and sisters in past years and also to his niece Irma Schultz, who was a daughter of his deceased brother Philip, and the testimony, as well as the evidence disclosed by his notes and his diary, show that he believed they had not appreciated his gifts and were intent on getting more money from him; that he had quarreled with them and had no longer a kindly disposition toward them.

After his wife's death he lived alone in one of the small houses he owned, which houses he had permitted to become dilapidated and run down although he continued to pay taxes on them. His living conditions were dirty and unkempt, which conditions he appears to have been unable to remedy because of the physical infirmities from which he suffered in his later years; he had an injured ankle and a diseased leg and in the last year or two of his life he had become incontinent. Police officers were called to his home on three occasions early in July, 1942. On two of those occasions they found him lying helpless on his bedroom floor, and on the third occasion he was lying in his empty bathtub fully dressed. He was conscious on those occasions but declined to answer questions concerning the predicaments in which he was found.

Apparently on two of the occasions he had fallen from bed. Because of those incidents (one of which the police reported to Bauer) he was urged by police officers, Anna Roggenbrodt and Bauer to go to a hospital, but he then declined.

On July 13th, 1942, Anna Roggenbrodt and her husband went to Heim's home in response to a telephone call and found him lying on the floor. Mrs. Roggenbrodt is a daughter-in-law of Pauline Roggenbrodt, a sister of Heim. Her testimony as to what occurred that day and the following day may be summarized as follows: She told Heim he could not keep this up, that he was too weak to be alone and should go to a hospital and that Heim agreed and said he wanted to settle his affairs and for her to call Bauer on the telephone, which she did. Heim then talked with Bauer a few minutes and her husband also talked with Bauer and told him Heim had consented to go to the hospital and wanted to see Bauer about settling his affairs. Bauer agreed to come the following morning but did not come until afternoon after Mrs. Roggenbrodt, who was with Heim all that day, had called Bauer on the telephone again. That afternoon, July 14th, Bauer after some casual conversation with Heim, advised Heim to go to the hospital, to which Heim agreed and Bauer said to Heim he understood Heim had sent for him to take care of his affairs and that Heim should make a will. Heim then told Bauer what he wanted done as to his real property and Bauer asked what about what is left and Heim said there was not much. There was a bank statement lying on Heim's bed which showed he had $14,000 in bank and Bauer remarked that it was a lot of money and that Heim should decide what he wanted done about his money, and Heim said, "You take it, Fred, and do as you like with it, it is yours." Bauer replied by asking if there were not some members of Heim's family he would like to leave it to and Heim said, "Oh, the wolves, those wolves have had enough, it is yours, Fred, take it and do as you like with it." Bauer wrote down what Heim told him and after he had left, Mrs. Roggenbrodt called up Dr. Shapiro, who had been in attendance on Heim and who came about 5 P. M., and she told the doctor to make arrangements for Heim to go to

the hospital. The doctor said he had not been paid for his services and that the hospital's entrance fee would have to be paid. She called Bauer on the telephone and was told to make out checks for the doctor and for the hospital. She made out checks from Heim's check book, one for $100 for the hospital and the other for $25 for Dr. Shapiro and after she had explained the checks to Heim in the presence of Dr. Shapiro and of the doctor who had come with the ambulance, Heim signed the checks and she delivered Dr. Shapiro's check to him. Heim was then taken to the hospital in the ambulance and she went with Dr. Shapiro and entered Heim at the hospital and delivered the hospital check for $100. After going to see Heim in his room, she left for her home. She had never met Bauer prior to July 14th. The will as executed contains the provisions Heim told Bauer he wanted therein.

The contestants discredit Mrs. Roggenbrodt's testimony because she stated that Bauer had told her husband he would take care of him out of estate funds. But it appears from Bauer's testimony that the promise was made a week after Heim's funeral, and before any contest over the will was threatened and it was made because of the help Roggenbrodt and his wife had given Bauer in connection with Heim's hospitalization and funeral and in giving information Bauer needed for the administration of the estate, and that Bauer had had no conversation with Roggenbrodt on the subject after the contest had started. The will gives to Mr. and Mrs. Roggenbrodt one-third of the proceeds of sale of testator's real estate, about $2,000, in trust for their son. If the will is not sustained, Mr. Roggenbrodt's mother, who resides with them, will share in testator's estate as one of his heirs-at-law and next of kin to the extent of $13,000 or more, so it would seem that if Mrs. Roggenbrodt's testimony could be affected by a personal interest, that interest would be in favor of her mother-in-law through whom her husband might profit eventually.

Bauer's testimony as to what led up to the preparation of the will may be summarized as follows: July 13th Mr. Roggenbrodt called him on the telephone and said Heim wanted

to talk with him and then Heim told Bauer over the telephone that he wanted to see him. Roggenbrodt took the telephone again and said Heim wanted to talk with him. Bauer said he would call the following morning, but he was unable to do so and in response to a call from Mrs. Roggenbrodt he said he would see Heim that afternoon, and he did. After some conversation with Heim about going to the hospital, Heim said he was ready to go and would like to fix things the way he wanted them to happen and Bauer said if Heim was ready he would prepare a will for him. Bauer found a piece of paper lying on a table on which he made a note of Heim's testamentary wishes. After Heim had stated the disposition he desired to make of his real estate and some conversation was had on that subject, Bauer asked what about the rest of his estate and Heim said, "You take that and do what the hell you want with it. There isn't much left any more." Bauer called Heim's attention to a bank statement lying on a table which showed $14,000 in the bank and said it was quite a sum and asked Heim if he did not have other bank books, to which Heim replied that there were other books in a drawer in a stand. Bauer and Mrs. Roggenbrodt looked in the drawer which was full of various articles, but could not find the books (they were found in that drawer after Heim's death). Bauer reminded Heim of his brother and two sisters and asked if Heim did not want to do something for them and Heim said, "The hell with them, they are a pack of wolves that got all they are going to get." Bauer then said, "It is too bad you feel that way. If you want me to have it, that is entirely up to you." And Heim replied, "This is my will and I am going to make it the way I want it." Bauer then asked who was going to take care of things and Heim replied Bauer could take care of everything, whereupon Bauer made note that he was to be executor. After some further conversation about going to the hospital Bauer left. Later that day Mrs. Roggenbrodt telephoned Bauer that Dr. Shapiro wanted checks for himself and the hospital and Bauer told her to draw the checks and have Heim sign them. The following morning Bauer went to the hospital and told Heim money would be necessary to look after him and Bauer

prepared a check for $3,000 to the order of Bauer's law firm which Heim signed, the proceeds of which were deposited in a trust account maintained by the law firm. Bauer prepared the will that day and at 4:30 o'clock that afternoon went to Heim's hospital room with two men who are associated with him in his law practice and who are reputable members of the bar of this state, to act as witnesses to the will. When the will was executed no one was present other than Heim, Bauer and the two witnesses. The testimony of Bauer and the two witnesses as to what occurred at the execution of the will follows.

The witnesses knew Heim, having seen him at Bauer's law office several times in preceding years. Bauer started to introduce them to Heim who said he knew them through seeing them at Bauer's office. Bauer asked Heim how he was being treated at the hospital and whether he wanted anything. Heim said he was being treated well and something was said about tobacco. Bauer said to Heim that they were there about his will and asked should he read it to Heim and Heim replied, "Yes, read it to me." Bauer then proceeded to read the will item by item and as he finished each item Heim said it was all right, except the item concerning the real estate, as to which Bauer explained to Heim that he had made a change from what Heim had told him, so as to provide for sale of the property and division of the proceeds, rather than give the property itself to the beneficiaries, which change Heim approved. After Bauer had finished reading the will, Heim propped himself up in bed, a magazine or other rest was procured and Heim signed the will in the presence of the two witnesses, whereupon Bauer asked Heim if he understood the paper he had signed and when Heim said "yes" Bauer asked him what it was and Heim said it was his will. Bauer asked Heim if he wanted the two men present to sign as witnesses and after Heim had said "yes," the witnesses signed in Heim's presence and in the presence of each other. Bauer asked Heim what he wanted done with the will and Heim told Bauer to take care of it. The proceedings occupied about half an hour and at some point therein one of the witnesses, looking out of the window, spoke to the other about

the bad condition of the opposite buildings and a brewery was mentioned, and Heim said the buildings were not so old and that he recalled the locality before any buildings were there. After execution of the will had been completed, the three visitors left the hospital, Bauer taking the will with him.

To the foregoing summarized testimony should be added certain exhibits (taken from a number of exhibits of the same nature dating back several years) showing acts performed by Heim relatively near the date of his will. Thus on June 5th he noted on a milk bill payment thereof, which payment he made by his check of that date; on June 15th he noted on an envelope from Life Publishing Co., also on an envelope from Zemzem Grotto and also on an envelope from Public Service Co. the receipt by him of those envelopes and, presumably, their contents; on July 1st he signed a check to the order of Electrotypers Union to pay assessment and dues, and on July 9th he drew a check to his own order, both check and check stub being in his handwriting and which check he endorsed and subsequently cashed. The hospital record of his admission July 14th contains the entry under the head of physical examination, "Emaciated old male talking incoherently at times and not appearing acutely ill" and the record for the night of July 14th is that he had a fairly comfortable night and talked incoherently "at times." The entries "at times" would indicate the exception to a general ability to talk coherently at all times. The record for July 15th shows that Heim spent a comfortable day and slept well through that night.

Competency to execute a will is a presumption of law and the right of testamentary disposition may be exercised by one of low mental capacity. *Buckman's Case*, 80 *N. J. Eq.* 556; *In re Haness*, 98 *N. J. Eq.* 645; *In re Hops*, 103 *N. J. Eq.* 11; *affirmed*, 147 *Atl. Rep.* 910; *In re Halton*, 111 *N. J. Eq.* 143; *In re Triebe*, 114 *N. J. Eq.* 227; *In re McComb*, 118 *N. J. Eq.* 119; *In re Lucas*, 124 *N. J. Eq.* 347; *In re Herrman*, 124 *N. J. Eq.* 542; *In re Loori*, 20 *N. J. Mis. R.* 376; *affirmed*, 132 *N. J. Eq.* 316. The time of a testator's competency relates to the time of execution of the will. *Buckman's Case, supra; In re Strang*, 109 *N. J. Eq.* 523; *In re*

*Delaney,* 131 *N. J. Eq.* 454. The burden of rebutting the presumption of testator's competency is on the contestants and must be sustained by a preponderance of proof. *In re Halton, supra; In re Loori, supra.* In the light of the evidence in favor of the will, let us examine the proofs adduced by contestants which they claim demonstrate the testator's lack of mental capacity.

Irma Schultz was a witness called by the present appellant. She resided at Trenton and was a niece of testator and the recipient of many and considerable benefactions from him before he quarreled with her over Public Service stock he had transferred to her name. She is an heir-at-law and next of kin who will share in the testator's estate if the will is not sustained. She wrote the testator lengthy letters May 19th and May 29th, 1942, in considerable detail concerning her family affairs and money difficulties, at which time she must have believed him competent to comprehend what she wrote. On direct examination she testified that Heim was on unfriendly terms with his sisters Adeline and Pauline and with his brother Charles; that she turned over to him dividends she had received on Public Service stock, some of which were received monthly, to within a short time prior to his going to the hospital; that she visited him on June 13th at which time he talked with her about dividends to fall due in two days and told her to keep them. She was not asked on her direct examination any other question which might have had any bearing on the testator's mental condition on July 15th, but the master allowed her to say on cross-examination that she had visited the testator at the hospital July 15th from noon until 4 P. M. and during all that time she did not discuss with him any of his affairs because he was too sick and did not understand. She also said on cross-examination that she had visited Heim on another occasion between June 13th and July 15th but did not discuss any business matter with him because he was too sick to understand; that she visited him at the hospital almost every week after July 15th and asked him questions to which he did not respond because he did not understand (which the testimony of Dr. Evans hereinafter referred to contradicts as does also the testimony of

Mrs. Roggenbrodt and Bauer), that he did not recognize her and called her "Pauline." Mrs. Roggenbrodt testified that a week or two before Heim entered the hospital he told her that the Schultzes had visited him and that they had had quite a scrap about money, and that testimony was not contradicted. Neither was Bauer's testimony contradicted that about that same time Mrs. Schultz telephoned him and said, "I cannot stand this nonsense of the old fool, the way he is carrying on here bawling me out and calling me down. I cannot stand for it." According to the testimony of Bauer and Mrs. Roggenbrodt, Mrs. Schultz was not at the hospital July 15th but was there July 16th and Mrs. Roggenbrodt testified that on July 16th Heim said to Mrs. Schultz, "Hell, Irma, I have no more worries. I have put everything in Mr. Bauer's hands," and that testimony was not contradicted. It seems impossibe to believe that if Mrs. Schultz was at Heim's bedside four hours July 15th they discussed none of his affairs. She did not say what was said by either of them during that long period, other than that Heim asked her to get his coat and hat out of the closet, but there was no closet there. If she was at the hospital July 15th, it was but half an hour after she had left that Bauer and the witnesses to the will arrived and their testimony as to what then occurred is so totally at variance with what Mrs. Schultz would have us believe was Heim's mental condition that day, that it can only be explained by saying that the three men deliberately perjured themselves.

Charles L. Heim is a son of Charles Heim who, as a brother of testator, will share in testator's estate if the will is not sustained. The will devises to Charles L. Heim and his wife as joint tenants, one-third of testator's real property, which devise amounts in value to about $2,000. By that devise the testator recognized the existence of such persons and showed his desire that they should have a portion of his estate. Charles L. Heim testified that he visited the testator June 26th and found him in bed fully dressed with overcoat on; that his bed condition was very bad because of Heim's incontinence; that Heim did not recognize him and said nothing (despite which he remained at Heim's bedside an hour and

a half); that he and his wife visited Heim July 12th, a very
hot day, for two hours and found him in bed in the same state
of dress as before and his bed condition still bad.   On this
second occasion the witness called to Heim and shook him
but Heim paid no attention to him, said nothing and did not
recognize him; that he visited Heim at the hospital July
18th and July 22d and on several subsequent occasions and
Heim did not recognize him; that notwithstanding the con-
dition he says Heim was in he sent Heim four postcards in
July and August because, he said, his uncle would "raise
Cain" if he did not get a postcard from him.   This witness'
testimony that on his visit to Heim July 12th Heim did not
recognize him and did not speak, cannot be true because he
also testified that on that occasion Heim said the windows
were open (when they were shut); that after Heim had
eaten ice cream they had brought him he said, "This is soup"
(it was a very hot day); that he said the lights were not
burning (when they were) and would not work; that the
witness filled Heim's pipe and put it in his mouth (but Heim
could not puff on it); that Heim told him the clock had
stopped (when it was going) and asked the witness to fix it;
that Heim said he was cold and wanted the witness to fix
the furnace (which had always been the witness' job); that
Heim asked for prunes (but there were none although Heim
said there were).

Florence Heim, wife of Charles L. Heim, was with her
husband on the visit to testator July 12th but did not remain
throughout the whole period with her husband.   She said that
when she entered the testator's bedroom she opened the win-
dows and that the testator said nothing about them.   She
gave no testimony as to Heim's condition July 12th and did
not in any way corroborate her husband's testimony as to what
occurred on that visit except as to the ice cream incident.
She visited testator at the hospital July 17th (not July 18th
as stated by her husband) and tried to talk with him but he
just mumbled.   She visited him subsequently and on one
of those visits he said he had a cigar his nephew had given
him and asked her to get matches which he said were on the
shelf or at the stove (there was no shelf or stove in his hos-

pital room); that on another visit he admired her hat which she held in her hand; that two days before he died she said to him as she left his room, "God bless you" and he replied "God bless you, too."

Dr. Evans, administrator or medical superintendent at the hospital, testified that he made several calls of two or three minutes each on Heim up to the time of Heim's death and thinks his first call was two weeks after Heim's arrival at the hospital. He made no examination of the patient, attempted no serious conversation with him, merely asked how he was and discussed pleasantries, recalled nothing Heim said to him and thought him a childish old man because he seemed overly affected by the visits; that Heim recognized him when he came in, and seemed to appreciate his visits and thinks Heim's condition improved for a time after he entered the hospital. Although there is nothing quite definite in the doctor's testimony, it would seem that if Heim showed any decided evidence of unstable mentality at any time he was in the hospital, the doctor would have had at least some slight recollection of it. In any event, his testimony discounts the testimony of contestants' witnesses who say that from the very day Heim entered the hospital he took no notice of any one and was uncommunicative.

Dr. Kaplan was an interne at the hospital from the time of Heim's admission and he saw Heim twenty-four hours after his admission and may have seen him the night of his arrival. He gave it as his opinion that Heim had no ability to comprehend anything, including the nature and extent of his relatives and friends or the nature of making a will, but examination of his testimony discloses that he was vague and indefinite as to the times and circumstances on which his opinion was based, except that he said Heim was never rational and that when he first saw him he was incoherent in speech and his answers had no relation to questions asked him, yet later on in his testimony he said that the extent of his conversations with Heim was to ask Heim how he felt and whether anything hurt or bothered him and that he got no response. His testimony is in sharp contrast with that of Dr. Evans and is in conflict with the testimony of witnesses

who saw and actually talked with Heim at the hospital and it is also in conflict with hospital records that Heim's mental condition was weak only "at times." The doctor's opinion of Heim's mental capacity is a conclusion based on facts or circumstances he did not relate and from which, had he given them, the court could reach its own conclusion as to whether Heim had sufficient mental capacity as defined by our decisions, to make a valid will. In any event it cannot be said to be certain from this doctor's testimony that on July 14th when Heim gave instructions for the preparation of his will, and on July 15th when he executed that will, he did not understand the nature and quality of the act in which he was then engaged.

William Beckler is the remaining witness on behalf of the contestants. He was a truckman who had undergone an operation at the hospital and stayed on as a porter. He was serving in that capacity the day Heim entered the hospital and thereafter until Heim died. His testimony is entitled to but little weight because too general and unrelated as to time. The only testimony he gave worthy of any consideration on the question of mental capacity is that he had no conversation with Heim other than some mornings Heim asked him to get up coal and put it in the stove. He had been engaged by Bauer to shave Heim but Heim did not like him and told Bauer why, for which Bauer reprimanded Beckler and Beckler testified that Heim found fault with him and told him to "get out of here."

The foregoing is a review of all the evidence on the subject of the testator's capacity to make a valid will. It is lengthy but I know of no shorter way of gathering together all the facts on which the claim of the contestants that the testator was mentally incompetent, can be given full and careful consideration. The question of competency must be determined as of the date of the will and the burden of showing mental incapacity, as defined by our cases, at that time, is on the contestants and I find that the credible evidence adduced in favor of such capacity outweighs the credible evidence adduced by contestants to show the contrary.

The contestants criticise Bauer for not calling **Dr. Shapiro**

and another person who had contact with Heim and who might have given testimony which would have aided in determining Heim's mental condition just prior to and at the time he executed his will. Those persons were equally available to the contestants (one was present at the hearings before the master) and could have been called by them. Considering where the burden of proof rested, it seems that the criticism might better be directed at the contestants.

The remaining question to be determined is whether the testator was influenced by Bauer as to the terms of the will he executed. I think that because the testimony shows some relation of trust and confidence existed between Heim and Bauer and because of the facts and circumstances surrounding the execution of the will, there was cast on Bauer the burden of showing that in the execution of the will he exerted no influence on the testator to bring about a provision therein so beneficial to himself. In considering whether the burden was sustained Bauer's testimony cannot be disregarded, unless it appears to have been successfully contradicted or discredited by other evidence (*Sparks' Case*, 63 *N. J. Eq.* 242; *In re Cooper's Will*, 75 *N. J. Eq.* 177; *affirmed, sub nom. Harrison* v. *Axtell*, 76 *N. J. Eq.* 614; *Ward* v. *Harrison*, 97 *N. J. Eq.* 309; *Loveridge* v. *Brown*, 98 *N. J. Eq.* 381), which I do not find to be the case.

Bauer has been a reputable member of the bar since 1911. He became acquainted with the testator in 1908 when be (Bauer) was a clerk in the office of a lawyer with whom Heim did business. In the early years of Bauer's clerkship his preceptor maintained office hours two evenings a week, and for a period of years Heim called on Bauer evenings and they discussed subjects in which they had a common interest. The social calls continued after Bauer had been admitted to the bar and because they resided in the same neighborhood, they met on the street at various times. Bauer became Heim's attorney and rendered services for him which included drawing wills for Heim and his wife and the preparation of Heim's income tax returns for years, to and including 1942. In Heim's diary under dates of March 3d, 1936 and March 3d, 1937, and on a sheet torn from a calendar of March 10th,

1942, Heim noted Bauer's attention to his income tax. In 1938 Heim called Bauer to his home and spoke with him about the will Bauer had drawn for him in 1928 in which his sister Pauline Roggenbrodt had been named sole beneficiary, and told Bauer he had torn his signature from the will because of a disagreement he had had with his sister. He told Bauer he wanted him to draw another will but would postpone it because of difficulties he was having with Irma Schultz over stocks. On another occasion Heim spoke to Bauer about a will but again delayed because he had not yet settled his troubles with Mrs. Schultz. In March, 1940, and about six weeks before Heim went to the hospital Heim again talked with Bauer about making a will. Thus it appears that the subject of a will was always broached by Heim and never by Bauer, and that the will here under consideration was not drawn until four years after Heim had first opened the subject of a will to Bauer. The details concerning how Bauer received Heim's instructions as to the terms of the will and as to how the will was executed, have been stated above. It appears from Bauer's testimony, fully corroborated by Anna Roggenbrodt, that the testator's statement of his desire to leave the bulk of his estate to Bauer was entirely voluntary, without any suggestion from Bauer; that Bauer was taken by surprise and at once sought to remind Heim of his relatives, and asked Heim if he would not like to leave his estate to them, which suggestion Heim promptly and emphatically rejected because, as his reply and testimony show, he had a strong antipathy for them and was determined to leave them nothing. There is not the slightest indication from any testimony in the case that Bauer had any part in creating or fostering that antipathy but rather that Bauer had sought to mollify Heim's feelings toward his relatives. With a feeling of bitterness against his relatives and with the necessity of disposing of his estate in some way and to some one, it is not unnatural that Heim's mind turned (or perhaps had previously turned) to Bauer who had been his friend and adviser for years. I have the thought that Bauer's surprise at being named by Heim was not only because he was so named but because of the munificence of the proffered gift,

the extent of which Bauer must have believed was much more than $14,000 shown by the bank statement at Heim's bedside, and the other bank books of which Heim spoke, because he had prepared Heim's income tax return for years. I have recited all the evidence there is in the case which has any bearing on the question of whether or not Bauer exercised any influence over Heim when the latter gave directions for the preparation of his will, or at or before the time the will was executed. There is no evidence that prior to the execution of the will Bauer had attempted to ingratiate himself with Heim by having close or intimate association with him, or by attempting to exclude Heim's relatives from access to him, or by even suggesting that Heim make a will. Of course Bauer had the opportunity to influence Heim's mind in his favor, but undue influence cannot be inferred from mere opportunity to exert it and no direct proof was offered to show that Bauer had controlled or had ever attempted to exercise control over Heim's mind. Heim was a free agent when he was called upon to execute the will in the presence of the two witnesses. It can be said that Bauer showed poor judgment in procuring witnesses who were his associates in business, yet it was natural that Bauer should not chance to rely on the possibility of finding witnesses available at the hospital, and that he should have selected persons who were not strangers to Heim rather than nurses or hospital attendants with whom Heim had not the opportunity to become familiar in the less than twenty-four hours he had been in the hospital. However that may be, Heim approved each item of the will as it was read to him and thus he affirmed his testamentary desire as to Bauer in the presence of those witnesses. When Heim told Bauer he proposed to give the residue of his state to Bauer, he did not state that his reason was because of his affection and esteem for Bauer or in recognition of Bauer's many kindnesses and favors to him, but such were evidently among his reasons, and when that item of the will was read to Heim and he affixed his signature he adopted as his own, the words which stated his reasons.

The contestants refer to acts on the part of Bauer which they claim should be considered as failure to disprove undue

influence exercised by Bauer over Heim, many of which are trivial and concern Bauer's acts some time after the will was executed. Others are that the morning of the day the will was executed Bauer had Heim sign a check for $3,000 and in August he had Heim sign another check for $7,500. Both checks were deposited in the trust bank account maintained by Bauer's law firm and an itemized record was kept on the books of the firm of said receipts and disbursements therefrom. Bauer knew that Heim's stay in the hospital would require money and he obtained the second check because he had been advised by the doctor that Heim might live a year or more and he thought the time might come when Heim would be too ill physically or mentally to sign checks. Bauer was the person in charge of Heim's welfare and comfort and he was the executor named in the will. None of Heim's relatives had offered to assume his care. Bauer was the one who would have to produce the needed money for Heim's expenses and he knew if he spent Heim's money recklessly he as residuary legatee, would be the one to suffer. He rendered a detailed and accurate account of the receipts and expenditures of the $10,500 to the administrator *pendente lite* appointed in the cause. The contestants make a point of Bauer's delay in rendering that account but the evidence that Bauer had received the money was always and readily available and the delay was fairly explained.

Bauer did not disclose until after Heim's death that a will had been executed. He was under no duty or obligation to make such disclosure unless questioned and no one asked him. When he presented the will for probate at the surrogate's office, he requested the probate clerk to keep it out of the newspapers, the reason for such request not appearing. That was a foolish request but I have known it to be made frequently. The will was a public record open to any one who might be interested in Heim's estate and immediately after the will was probated Bauer sent copies to Heim's relatives.

Bauer's relations with Heim were open and known to the contestants, or to most of them, before and after the date of the will. After Heim had gone to the hospital, Bauer visited him frequently and between August 11th, 1942, and Heim's

death he wrote six letters to Heim's relatives informing them of changes in Heim's physical and mental condition and stating that he had received a substantial sum from Heim (in one letter he mentioned $13,000) to pay for his hospital care and that he would have to use some of it to pay taxes on Heim's real estate because Heim insisted on his so doing. After Heim's death he wrote several more letters to those relatives wherein he said he would be glad to answer any questions concerning Heim's affairs and that he would probate the will and send copies, which he did three days after probate. When it appeared that Heim was about to die, as well as on the day of Heim's death, he sent telegrams to all known, relatives.

It is my conclusion that Bauer had fully sustained the burden on him of showing that he had exerted no influence over Heim regarding the terms of the will, and having also concluded that the testimony before the master showed that Heim possessed testamentary capacity at the date and execution of the will and that the contestants had not sustained the burden of proving otherwise, I find that the decree of the Hudson Orphans Court setting aside probate of the will was erroneously entered and should be reversed.

By orders of the Orphans Court entered March 28th and March 31st, 1944, allowances were made to the master, to the administrator *pendente lite* and his counsel, to proctors for the contestants and Bauer, all to be paid by the administrator *pendente lite* out of the estate in his hands, the total of which allowances is $19,500, or more than 20% of the gross estate. Presumably they were based on affidavits filed with the court purporting to show services rendered and time devoted in the, performance of those services. Appeals from the allowances were filed by Irma Schultz, Jeanette Heim and Bauer. The point of view on the question of allowances is different now, than it was when they were made by the Orphans Court. Then, since probate of the will was set aside, the allowance would be borne by the next of kin. Now, as the result of the conclusions I have reached on the main appeal, Bauer will pay them. Nevertheless I am required to pass on their reasonableness and in doing so I have examined the whole tran-

script of the record in the case including the aforesaid affidavits, and I have reached the following conclusions.

The master stated in his affidavit that he had devoted sixty full court days of five hours each to the performance of his duties. He sat four days for taking testimony and part of the fifth day to receive two sets of briefs. It would seem that fifteen working days thereafter would have been ample for his consideration of the testimony and briefs, for inspection of such exhibits as were referred to in the briefs and of such other exhibits that he deemed of importance, for examination of the cases cited to him and other cases, and for the preparation of his report, thus making a total of twenty working days fairly to be devoted to his duties. I think $2,500 is a fair allowance for his services and that the order of the Orphans Court allowing him $4,500 should be modified accordingly.

The administrator *pendente lite* was appointed March 23d, 1943, and he had served a few days more than a year when the order for his allowance was entered. His affidavit indicates that he devoted 200 hours to his duties. It appears that he performed more than the usual duties of an administrator such as merely receiving and holding assets of the estate and preparing an inventory and appraisement, in that among other things he prepared and filed inheritance and income tax returns and worked on federal income tax returns, sold the testator's real estate under order of the court, sold or exchanged some estate securities and invested estate funds in bonds. Ordinarily an administrator *pendente lite* receives no allowance until he has filed his account and been discharged, but an allowance may be made properly on account of services when it appears that settlement of the estate in his hands may not be concluded speedily. I consider that the allowance of $2,500 to him was generous and in full for services he had rendered up to the entry of the order allowing it, and I think it was sufficiently large to cover the greater part of legal work for which he retained counsel without applying to the court for authority to do so, which work he could have performed himself. He is a counsellor-at-law of this state of twelve years standing and he was able and competent to attend personally to all legal matters which arose in connec-

tion with his duties and he had the opportunity and benefit of advice from the proctors for contestants and for Bauer. *R. S.* 3:11–8 is not authority for employment of counsel for a fiduciary and for the allowance of fees to such counsel. The affidavit presented by his counsel is quite general in statement and seems to repeat items of service contained in the administrator's affidavit. For such services therein shown as it is possible the administrator might have required legal assistance, an allowance of $500 would have been ample. The order of the Orphans Court making an allowance of $1,500 to counsel for the administrator should be modified accordingly.

As to the allowance to proctors for the contestants Howard Heim, Florence Heim, Adeline Butterfield and Charles Heim and to proctors for Bauer of $5,000 each, I would say that they were too generous. I appreciate that preparation of the case must have consumed considerable time and the records show that the contest before the master was conducted vigorously on both sides. Undoubtedly the briefs prepared by the proctors for the master were able and exhaustive both as to the facts and the law. While the proctor appearing for the contestants named above, who filed or joined in the appeal from probate, conducted the hearings before the master on behalf of those whom he represented as well as on behalf of the other contestants, he had the assistance of the proctors who appeared for those other contestants. Considering all the foregoing and the affidavits showing services performed and time devoted to such services, I think an allowance of $4,000 each to said proctors would be liberal and the order of the Orphans Court fixing such allowances should be modified accordingly.

Proctors for contestants Irma Schultz and Jeanette Heim appeal from the allowance of $250 made to them on the ground that the allowance was inadequate. It is an allowance like in amount to the allowance made to three proctors for other contestants. The record discloses that the appealing proctors rendered more service in the conduct of the cause than did those other proctors and therefore I think they should have been allowed $750. The Orphans Court order making such allowances should be modified accordingly.